Mr. Anderson, you may proceed. Good morning, Your Honor. May it please the Court, my name is Carl Anderson. I represent the defendant appellant, Nexus, et al. This case boils down to three primary points. First, the district court wrongly applied the black letter law in Illinois when it refused to consider the trade usage of the terms of the agreement. Second, the district court imposed its own standard instead of the bargain for standard of the parties in the agreement. It misapplied the holding of an out-of-circuit case and applied a reasonableness standard instead of the bargain for objective standard of exposure bargained for by the parties. And third, it justified these errors by imposing and misapplying the holding as it relates to the collateralization of immigration bonds. Mr. Anderson, as to your trade usage evidence, your expert only testified about the meaning of the term in the present contract. Was any evidence presented as to the general usage in the industry besides just this contract? Yes, Your Honor. There was also an expert provided by the plaintiffs in this case that generally spoke to the way in which the collateralization of bonds as it relates to the industry as well as this agreement. What did he say? What did the plaintiff's expert say that would have helped you? That it was actually that there was that the word exposure directly related to the anticipated and future losses of the word exposure. And that's where exposure is tied to. And there's evidence of that in the plaintiff's expert report. Why did your conduct give rise to anticipated risk in this case? Well, as it relates to immigration bonds, when there's a notice to appear, that creates the anticipated and risk of a future loss, and that triggers the exposure that we're directly speaking to here about the collateral security that is appropriate to request under the agreement. We believe that there's evidence in the record, and the case law presents that this, in fact, is a case of first impression regarding the collateralization of immigration bonds. And we believe that the district court looked outside the four corners of the agreement and imposed its own collateral security amount regarding the reasonableness of the original demand. And that's not what the parties bargained for in the terms of the agreement. The terms of the agreement suggested that when a discharge of a bond is unobtainable, that the collateral security amount needs to be sufficient to cover all exposure under such bond or bonds. Well, counsel, before it says exposure, it says acceptable to surety. I mean, that to me suggests the surety has some say-so over what's acceptable as exposure. I mean, don't talk about that language. What does that mean? Your Honor, yes, the clause, it looked in the totality. It is a back and forth. However, looking at the whole clause, it says when a bond participant or when a discharge is unobtainable, and that is the triggering mechanism. In fact, in many ways, the bond amount, the collateral security amount, could go even lower than the penal sum, which is what we were discussing in our briefs. However, while it does need to be acceptable to the surety, it must be triggered upon the bond itself. And in the immigration context, we're only talking about the particular singular bond when that discharge is unobtainable. And therefore, it is not looked at in terms of the overall large pool of bonds. It's only that particular bond upon which security should be requested because that is the particular exposure that the plaintiffs would be exposed to. And the Safeco case, I believe, is very determinative on this particular point. It says that there needs to be reasonably certain risk of future loss when the exposure is presented. And I believe that the record is clear that when the bond principle fails to appear, that is what's triggered and that is what creates the exposure on the bond. And therefore, collateral tied to the particular notice to appear is appropriate. How do you think the district court should have decided what was the appropriate amount of collateral? I believe that the district court should have focused on the terms of the agreement rather than impose its own standard of reasonableness. Directly tying the collateral security to the exposure under such bonds where there was a notice to appear. And these are sometimes moving targets in terms of at any given time the bond participant can appear,  and therefore the collateral security either would be held or returned, in this case, to the indemnitors. Counsel, just to follow up a little bit, I mean, your argument about penal sums and triggering events based on notice to appear,  it would seem to me that you could draft an agreement that has those sort of events and terminology in it. But you didn't, or you signed one that didn't. It seems to me we've got to deal with the terms here. And, you know, I know your argument is under the trade usage, they mean the things you're talking about. But if we think the agreement is clear as it's written, is there any requirement to go outside the agreement to trade usage? Your Honor, the Black Letter Law of Illinois says that trade usage explanation and evidence can be considered by the district court, whether it's an ambiguous or unambiguous contract. It can be, but if the district court doesn't, I mean, and I get the argument that maybe the district court should have addressed it, but if the district court thought the agreement was clear and did not need, you know, outside evidence, even trade secret or trade usage evidence, I mean, wouldn't it be appropriate to apply the terms as drafted? That's correct, Your Honor. However, the district court focused on the reasonableness of the request rather than triggering on the exposure under such bonds. Sure. Look, I think you have a point that, I mean, we can talk about it. I mean, yeah, I think the district court did do that and maybe that was improper. But nevertheless, I don't know that that helps you, quite frankly, because I think if anything, you know, the plain or it seems to me that the plain language gives, you know, a lot of deference to what the surety finds acceptable. And I'm not sure adding reasonableness to it didn't help your client rather than hurt it. Well, I think even if it's acceptable to the surety, but it has to be triggered and related to the unobtainable bonds themselves. It can't just be a sole discretionary amount. There's evidence in the record with comparison agreements that that was a standard that they had negotiated in other contracts. However, in this contract, RLI specifically negotiated for the collateral security to be solely based on exposure, which means that the immigration bond process must be triggered by the bond participant's failure to appear. And therefore, we believe that the district court was looking outside the four corners and based its reasonableness determination of the collateral security amount on evidence and information that occurred subsequent to the original contract's formation. This was a form adhesion contract that RLI used. Adhesion? I mean, well, I mean, y'all are two businesses. I mean, is your argument that you shouldn't be bound by the terms because it's an adhesion contract? No, simply, Your Honor, that this was a contract that they had used in many other cases. And we have shown that and there's evidence in the record of those other agreements. But that both and we're not saying that either party did not have a proper bargaining position. What we're arguing is that we both negotiated for this collateral security requirement to be hinged on and focused based solely on exposure of such bonds. And therefore, when the bond is and the discharge is unobtainable, the exposure and the reasonably certain risk of future loss on those particular bonds are what the collateral security required amount needs to be focused on. And while it needs to be acceptable to the surety, it can't go over and above the amount that is related to those unobtainable bonds. Not the overall large pool, the immigration bonds themselves. And that's why we believe that Safeco and the district court are very informative as it. But they need to be looked at through the lens of the immigration bond context and framework. These are not these are individual bonds and the participants operate individually. They are not tied. They are not grouped together on, say, a project such as construction bonds, which is where Safeco is really very informative. And that is why we believe that this is a unique opportunity for the circuit to address the way in which collateralization under immigration bonds properly function. And where the bonds are triggered and focused very specifically to the particular bond that a claim has been made, which would be a DHS process when it issues its notice to appear. What amount, if any, is due RLI? Well, that is often a moving target, given that the notice to appear, many, several of them are, frankly, dozens, I believe, currently are there. And the amounts vary. And there's a process by which the notice to appear, say, mature, ripen into, say, a notice of breach. And then we're into the indemnification. At the time you tried the case, what was the amount that was due to RLI, in your opinion? There's no moving target at that point in time. Perhaps my opposing counsel can actually speak to the number because I don't have it on the tip of my tongue. But there were, I believe, what triggered this were three particular bonds, if I'm not mistaken. And I believe the briefs do outline, at the time, the exact numbers that I don't have handy. So we believe it was to replace, for the district court to replace its own judgment as to what was a reasonable amount. We believe that was acting outside the four corners of the contract and agreement itself, which was that the collateral needed to be based solely on the exposure of such bonds that were unobtainable and must be triggered, which was only triggered by the non-appearance of the bond principle. Well, what about the fact that to cover also all liability that may come by reason of the bond itself? In the language that it wouldn't have to be that event to be inclusive in all liability that may be there by reason of the bond, not by circumstances of appearance, but by reason of the bond. How do you get around that language to somehow limit exposure to just those events? Well, the Safeco case focuses on the reasonably certain risk of future loss. And the 3D clause looked and looking at the 3D indemnity agreement clause focuses on the exposure of the unobtainable bonds. So I believe we're only focusing on the bonds where the discharge is unobtainable. So there's a notice of appearance. Then the bond participant needs to either be located and appear and present themselves to the immigration administrative process. And when that does not, and that is what the collateral is hopefully ensuring that at the end, when there's a breach, that there's either exoneration or subjugation by the indemnitor here. And so the security really is only tied for that particular bond participant to that final event that DHS and the immigration process is directly in charge of. And actually the appearance of the bond participant can satisfy the conditions of the bond. All right. All right, counsel. Thank you so much. Ms. Anderson. Thank you, Your Honor. Ms. Katz-Antones. Thank you, Your Honor. May it please the court. Vivian Katz-Antones on behalf of O'Kelly RLI Insurance Company. Nexus crystallized its opinion or its position here in its reply brief. And what it said is that there's only one issue before the court. It's the meaning of exposure. And what Nexus agrees, what it says is that exposure is unambiguous. They agree that it's unambiguous. They agree that the meaning is a reasonable expectation of loss, exactly what the district court held. And they also agree that extrinsic expert evidence is not necessary to interpret. What they say is case law and logic take the same result. So there really is no dispute here. There is complete agreement as to what is the meaning of the word exposure. They even say that that's commonly understood in the trade usage as a reasonable expectation of loss. So again, there's no disagreement here with regard to what the meaning of exposure. But what they're saying instead is that in order to have exposure, there has to be this triggering event. And it's not only an exposure. It's saying in order to have a risk loss, there has to be some sort of triggering event, which is failure to appear. For that proposition, Nexus cites no case law whatsoever and no evidence whatsoever. There's no language in the indemnity agreement at all to support this meaning. There's nothing in the indemnity agreement that somehow ties or limits RLIs collateral under CD to some triggering event or to a claim or to a non-appearance. Council, could I ask a question before you go much further? The language that allows RLI as surety to request collateral, that sentence begins with if such discharge is unattainable. What does that mean? Well, Your Honor, the surety can request that it be discharged from its liability under the bond. And in fact, the application happened here. And the discharge can be done in many ways. One way is that the Nexus could have posted and put in cash collateral for all the bonds. They could have just paid cash to discharge our liability. The Department of Homeland Security. They could have also obtained a replacement. If you look in the record, RLI contended to do that at many times, many times, to sustain our discharge under the bond. And so there's numerous ways in which you can sustain our discharge under the bond. They were unable to do so. And as a result, we were asking for collateral based on our exposure under those bonds. And a rich history to support our process with the bonds. We had half years at the time of the hearing, at least, of a track record of what our risks had been and what our exposures had been on these bonds. And that's known for all the facts that the court considered in remedying, including the collateral amount. You know, so, your Honor, what we have here is Nexus completely agreeing the definition. You don't even need to go to the evidence to agree that the definition is the reasonable expectation of loss. And in any, and that's exactly what was applied here, consistent with case law in, throughout the court, throughout the district court. We cited to numerous cases, at least the Dustin Stott Moore in our brief, which enforced, enforced similar persistence in certificate indemnity agreements prior to, you know, the deposit of collateral, to discover the surety of uncertain risks and potential losses. And here, what we had was the district court followed expressly Illinois law, and by the plain meaning of the semi-agreement as written, finding it clear and unambiguous as all the parties urged the court to do, and harmonizing all the provisions of the contract to render the meaning of exposure. And in this regard, you know, the court looked to, what Nexus is really saying is, a notice to appear is essentially the event, when there's a non-appearance, as they're asserting, that is the brief. That is a claim made by the government. And so they're really saying what indemnity agreement says under 2A2, which is when there's a claim under the bond, then ROI is required to postpone to either pay that claim or that can be used as collateral. They're saying the exact same thing. Below, that's chaotic. They said 3D is limited to bonds that have been booked, which they said either a claim is asserted by the government or the bond principal fails to appear. In their appellant brief, they kind of take out the words, the claim, because they don't want to show the obvious contradiction. But that's what it is. When a bond principal doesn't appear, the government issues a notice to deliver. And that's a claim for our bond. That is conditions of the bond, or that the immigrant will appear, and they are, as claimed, trying to limit ROI collateral rights under 3D. Clearly, 3D is intended to prescribe much broader rights to collateral for all of our exposure. Ma'am, what are, if there are any conditions preceded for you asking for the collateral? Well, Your Honor, there's no specific conditions precedent. The only condition in the bond is that we will request that they procure our discharge. And if it's unattainable, then they have to post the collateral. So, you know, as the Court is certainly well aware, any conditions precedent under Illinois law must be expressed unambiguously. So any arguments of any other conditions precedent run afoul of Illinois law and are contrary to the express terms of the Indemnity Agreement. Your Honor, the Nexus has provided no evidence whatsoever, nothing. And I know the Court was asking about the Expert Report. It provided no evidence to support that somehow in the integration contract, which I would also note, they don't ever define trade. But, you know, at one point, it's about risk management trade. At another point, they're talking about integration bonds. There's trade identified. And they cite no evidence and no case law, as we stated, that talk about any sort of standard of a non-appearance. Counsel? Counsel? Yes, Your Honor. May I get back to Judge Floyd's question a little bit? Are you saying basically it was the high breach rate that caused the triggering and request this collateral? Is that what drove it? Your Honor, what drove the initial request for the discharge from the bond or the collateral was a series of events. And there was multiple factors. There was the increase in the breach rate that the Court is referencing. There was, at the same time, they had failed to post any collateral. At the same time, they were not paying breached bonds. We asked specifically for the payment of breached bonds. And the undisputed record is clear. They weren't paying them. Not only that, they gave us a justification for our payment, saying that payments were made. In fact, they had to be paid. They also advised us for a rate of 62%. At that point in time, it was pretty at 62%. So, continuing, next, this had made representations, the breach rate was 2%. Next, this had made representations to bonds within the vast majority of six months. But instead, we were having a breach rate that was climbing. At the end of December of 2017, it was already at 37%, I believe. We were at, and the breach, the bonds outstanding were not being canceled within six months. And we were seeing long-tailed breach bonds that were lasting much longer. Next, this had stopped communicating with us. They were not giving us information on bond breaches. They were not attending meetings. So, there was a host of undisputed facts that led to the initial request for discharge and for the collateral amount. And the court found, this report found that all of ROI's requests were consistent with the indemnity agreement and well within its rights with regard to those requests, Your Honor. Let me ask this question. And obviously, you know well more about this than I do. You're counsel, you're the experts. But if I can make my question clear to you, there's a point, the beginning is the bond is issued, correct? There's someone who's before the immigration process and they need to post a bond in order to be released pending, whatever is pending before immigration, IGA or BIA or whatever it might be, right? That's the issue. I call that the issue, right? Yes, Your Honor. In terms of your clear understanding what exposure is, are you saying that exposure includes from the moment it's issued or something has to happen after issuance? Because I want to make sure, are you saying that you're exposed once it's issued and that includes exposure or there's something else after that, a subsequent act has to occur before it ripens into exposure? If you understand my question, I want you to answer that for me. I do, Your Honor. Our exposure occurs at the time we issue the bond. At that point, we are liable. We are legally liable to the government under these bonds. And exposure is the amount of liability or other risks to which a person is subject. And at that time, we are legally obligated and accountable to U.S. government for those to satisfy the conditions under the bond. And that is our liability. The risk is an uncertainty, a chance of loss in the existence of that farm. And our exposure changes. Obviously, our risk of loss changes as we continue to go forward. And that's what the bond…  Risk doesn't have anything to do with exposure. Risk might obviously increase the likelihood you're going to have to pay something. But if you Venn diagram it, exposure covers all of that. Because if it's a low risk, you're exposed. That's just a matter of degree, but not definition. If you're saying that exposure includes issuance, that's the whole ball of wax. Yeah, we agree, Your Honor, that our exposure is the whole ball of wax. Exposure, our exposure is the liability we're exposed to at the time that we issue those bonds. And, you know, the courts have interpreted in the indemnity agreement, exposure to be the reasonably anticipated risk of loss. And so that is the definition that's been applied by the courts in interpreting the indemnity agreement. And that's what the indemnity agreement provides. There's many parts of the indemnity agreement that are to protect the surety from a risk of loss. Because when a surety issues a bond, it doesn't expect to confer any loss of risk of loss. And so in that regard, the bond sets forth certain mechanisms, there's four of them, to ensure and protect that the surety never has a loss. And that's what the expectation is at the start of the issuance of the bonds, is to be zero loss. And so to protect that zero loss, the surety has not only the right to indemnity, but they have the right to exoneration, which means that in this case, Nexus will stand in front of the surety every time and perform under the bond. And then the surety also is granted the right of books and records, and that is so the surety can evaluate its risk as the program continues. And even under paragraph 3C, which is the surety's right to the books and records, it's again, you have that right until you are discarded from all of your liability under the bond. It anticipates that you have this continuing right to review and analyze your risk, so you have those rights, that then go to 3D, which is the right to ask, cover your exposure. It's like those mortgage contracts that say, we can foreclose, even if you've paid all of your mortgage payments, if you do something in your dealings that we think that somehow changes your risk. Right. That's right. Ma'am, can you put your hands on section 3D of that agreement? Is it something readily available? Yes, John. All right. Starting on the second line down, indemnitors will, upon request of the surety, procure the discharge of surety from any bond and all liability by reason thereof. Is there any limiting language that limits the collateral to breached bonds? Not at all, Your Honor. That's exactly what the district court found, and that is consistent with even the case law in numerous districts that have held the same, including the Safeco case that the court followed as affirmed by the Second Circuit. So, counsel, Judge Hoard, are you finished? I'm sorry. Yes. Okay. Counsel, I understand that part of your argument. Do you believe it was appropriate for the district court to include a reasonableness standard in evaluating exposure? Because it didn't sound like that was your argument before the district court. It sounded like before the district court, you said, much like you, I think, are saying today, that this contract gives you the right to demand collateral for the whole ball of wax, so to speak, as Judge Gregory said. And, of course, you didn't seek that collateral for that amount. But my question is, do you agree that the district court was correct in using the term reasonableness to define exposure and taking evidence on that? Yes, Your Honor. I think, you know, certainly we believe that the $10 million we asked for was reasonable to serve Kansas. But this situation, Your Honor, the district court is granted broad discretionary authority to grant specific exposure. And it's within the court's realm. In fact, when the court is enacting its broad discretionary authority, it's confined to and must use reasonable standards. Otherwise, it'd be an abuse of discretion. And so... Why would it... I mean, I know there's an inherent obligation of good faith and fair dealing. But if the agreement says it's whatever collateral is acceptable to you based on the risk, isn't inserting an objective reasonable standard inconsistent with that? Your Honor, I believe that the court, again, you know, it's a specific performance remedy. And so the court permitted... We believe that our request was consistent and with what was acceptable to us and what was reasonable. And I think that the court, by interjecting reasonableness, was interjecting his discretionary authority under specific performance. Okay. Thank you. Thank you, counsel. Mr. Anderson, you have some time reserved. Thank you, Your Honor. I believe Judge Floyd, you raised a very interesting question as to really what is the limiting factor. And I believe that paragraph 3D of the agreement has that limiting factor language in it. Where is that language? What does it say? It says that if the discharge is unobtainable, indemnitors will, at the request of the surety, either deposit collateral with the surety, acceptable to the surety, sufficient to cover exposure under such bonds or bonds or make provisions available. I believe we're talking about where the discharge is unobtainable. So there's a period of time when DHS has issued a notice of appearance and the ultimate discharge of this particular bond and the participant subjecting themselves to appear at the DHS hearing, that is at issue. And I believe if the district court had properly addressed what this exposure was and what the process was in terms of the integration bond framework, we wouldn't be having this discussion. Instead, it replaced its own judgment as to what was a reasonable determination rather than the objective language contained in this particular clause of paragraph 3D. But didn't RLI ask to discharge all bonds? And, Your Honor, at the very beginning, there was no, that wasn't going to be possible by nexus given that really the way in which the bonds and the process works is there's no money that changes hands other than the premiums paid by nexus to RLI when the bond is actually created, the obligation is created. The satisfaction occurs either upon the appearance of the bond participant or later when nexus, as the indemnitor, steps in the breach and pays the subjugation or exoneration of that particular bond. Excuse me. I don't think you answered Judge Floyd's question. I think the question was, didn't RLI request all bonds? They did. And in light of the fact that nexus could not produce or discharge all the bonds, they had their demand of the $10 million collateral security payment, which we believe was not a good faith effort to discharge all the bonds given the circumstances. I guess it goes back to Judge Qualamon's query to you. It's your contract, and it's clearly, it's favorable to RLI when it comes to making them comfortable to make sure they stay ahead of the curve. And as counsel said, we have no exposure to have to pay. We stay ahead of you. It's written that way. It was never really intended that they would have to pay anything, and therefore we're going to make sure we're comfortable. We have a margin ahead of us. There's more behind. I mean, that's the contract. You're not saying it's a contract, but usually you seem to be arm-lift bargain to corporations. Because you start off answering Judge Floyd's question, like, well, that's not possible. We don't have any money. It's the only money exchange. Is that the way we interpret the contract? How deep your coffers are to satisfy the terms of the contract? Well, Your Honor, we're not saying that we didn't have... In fact, no bond... RLI has been compensated for any of the breached bonds to date. They have not had to pay any money on those particular bonds. And in fact, they have received the premiums throughout this. Now, there has been discussion, and there's evidence in the record that it took some time, but to date, RLI has been compensated, and Nexus has been making those payments. Including interest? All interest? I would have to verify whether the interest has been made, but... Okay. But you can't represent that all money? No, other than what was in our briefs, Your Honor. I see my time is up. Yes. Any further questions of the court? All right. Mr. Stanton, you're on your rebuttal, so I'll give you a minute to close your thoughts. My original thought was back to Judge Floyd's question, and I would just say that the nature of the collateral provided is not always good. If the district court had focused entirely on the exposure, and we had actually examined what the exposure was under the particular bonds, we would be in a much different situation. And instead of focusing on exposure, the district court replaced that bargain for term in the agreement with its standard, with its reasonableness determination. All right. Thank you so much, Mr. Anderson, Mr. Katz and Antonis. Thank you so much for your arguments. Thank you, Your Honor. We would love to come down and shake your hands as we do in the Fourth Circuit, but we can't do that. But nonetheless, we very much appreciate you being here and wish you well and stay safe. Thank you, counsel. Thank you, Your Honor.
judges: Roger L. Gregory, Henry F. Floyd, A. Marvin Quattlebaum Jr.